### LANDERS v. NEW IBERIA MOTOR CO., Inc.*
### No. 1360.

Court of Appeal of Louisiana. First Circuit.
June 11, 1934.

Walter J. Burke and James L. Helm, both of New Iberia, for appellant.

Porteus R. Burke and Jacob S. Landry, both of New Iberia, for appellee.

MOUTON, Judge.

Plaintiff, claiming to have suffered an injury to his left eye while an employee of defendant corporation, brings this suit for compensation against defendant under the Employers' Liability Act (Act No. 20 of 1914, as amended).

Judgment was rendered in favor of plaintiff, from which defendant corporation appeals.

Plaintiff was employed in mechanical work and automobile painting by defendant corporation. He claims to have suffered injury to his left eye on November 1, 1932, while painting an automobile for his employer.

Plaintiff testifies, that while mixing the Duco paint he was using on the auto with a thinner known as the Neptolac, he "splashed" paint in his left eye and the side of his face. He was using a paddle at the time and evidently the splashing of this paint must have been done with some force.

The next morning, he says, his left eye was bloodshot.

Mr. Rudolph Gary, who was working with plaintiff, testifies, that plaintiff got this paint in his left eye while mixing it with the thinner, that immediately after the accident plaintiff's eye was bloodshot, and that plaintiff said it was burning. After washing his face, Mr. Gary says, plaintiff went in the office of defendant company and applied some murine to his eye.

The burning sensation of the eye, its bloodshot appearance, and the application by plaintiff of murine for relief, clearly indicate that plaintiff suffered an injury to his left eye, as testified to by him, corroborated, as his evidence is, by the testimony of his fellow laborer, Mr. Gary.

Plaintiff continued in his work for defendant and discovered in the following December that his vision was blurred. He explains that his impaired vision did not come up suddenly, but gradually. When plaintiff realized he was losing his eyesight in the left eye, he called on Dr. Fisher of New Iberia, an optometrist.

*Rehearing denied June 30, 1934.

Dr. Fisher found no trouble with plaintiff's eye and evidently had no treatment to offer. It may be remarked in this connection that Dr. Fisher is not an eye specialist.

Plaintiff then called on Dr. Lebourgeois, an eye specialist of New Iberia, who found that the pupil of the eye was moderately dilated, but did not find any disease to the external structure of the eye.

Dr. Lebourgeois said that plaintiff's tonsils were moderately affected and that this was the only source of infection that could be found, and advised the removal of his tonsils. He saw no scar on plaintiff's eye, nor any ulcer.

After he was examined by Dr. Lebourgeois, plaintiff went to New Orleans for consultation with Drs. Jules and Homer Dupuy, eye specialists.

Plaintiff's eye was examined by Dr. Jules Dupuy on January 2, 1933, at his office in New Orleans, who found a corneal ulcer on plaintiff's left eye. Dr. Homer Dupuy did not testify in the case, but concurred in this diagnosis.

Dr. Lebourgeois said in his testimony that an ulcer could have developed on plaintiff's eye at the time the examination was made by Dr. Dupuy. He stated this was possible but not probable. This is an instance, however, where the possible happened.

It is shown that prior to the accident plaintiff was in the service of defendant corporation for a period of three or four years, and there is no proof whatsoever that he ever suffered from the slightest affection of either the left or right eye or with any other trouble during that time.

His evidence is that his eyesight was perfect before he splashed this paint into his left eye, and there is nothing in this record to indicate otherwise.

Miss Segura, instructrice of chemistry at Southwestern Institute, Lafayette, La., and who holds a degree from Tulane, testified in this case.

A sample of the thinner handed to her by Mr. Landry of New Iberia, obtained from plaintiff, and which had gone in plaintiff's eye with the paint, was analyzed by her in the chemical laboratory of the institute. The ingredients of the thinner, she testified, were poisonous, irritating, and injurious. Knowing, she says, from a course taken by her at Newcomb, that a cat's eye is structurally the same as the human eye, using a dropper, and as a test, she dropped one drop of this thinner in a cat's eye. The cat jumped around for about an hour after the application of the drop of this thinner, closed his eye, and suffered an irritation in his eye of a pronounced character. It will be observed, that the thinner in the cat's eye was limited to one drop by Miss Segura.

In this case, more than one drop might have gone into plaintiff's left eye, splashed in there, as it was, with a paddle plaintiff was handling in his work. It seems to us, judging from the effect of one drop of the thinner in the cat's eye, that the irritation to plaintiff's eye must have been considerable at the time of the accident, which it would seem subsequently blurred his vision in the left eye, where an ulcer had developed when he was later examined by Dr. Dupuy of New Orleans.

Dr. Jules Dupuy says that a corneal ulcer may be caused by a trauma, that is, by any external injury, for instance by a blow or a scratch, or can be caused by a constitutional disorder.

When Dr. Dupuy first saw plaintiff's eye, he thought the cause of its condition was traumatic and, after plaintiff gave him the history of his trouble, he concluded that it was due to a trauma. He ascribed his ulcer and loss of vision in the left eye to the paint and thinner that he had splashed in that eye.

On January 10, 1933, plaintiff, with the consent of Dr. Dupuy, was sent to Dr. Bahn, eye specialist of New Orleans, for examination, who found no evidence of corneal ulcer. This is not surprising, as it is shown by Dr. Dupuy that the ulcer had disappeared before plaintiff's eye was examined by Dr. Bahn.

This medical expert, Dr. Bahn, says that plaintiff had no scar in his left eye indicating that he had suffered with an ulcer.

Other physicians testify that a scar would have remained there if there had been an ulceration of that eye.

Dr. Jules Dupuy says that corneal ulcers are occasionally of sufficient severity to be seen with the naked eye. He says that, after applying fluorescein to the eye, if there is any ulceration, it will certainly be seen although not visible to the naked eye. He explains that fluorescein is a greenish substance, and, when mixed with the tears of the eye, "forms a greenish taint which settles at the base of the ulcer and very clearly outlines it."

It is hard to believe that a physician with the experience and qualifications of Dr. Jules Dupuy could, after applying the test to which he refers, have seen an ulcer where none existed.

It will hardly be disputed that an ulcer can

be caused by a trauma, that is, by any external injury, as explained by Dr. Dupuy. The left eye of the plaintiff was unquestionably subjected to external force when this paint, with the thinner, was splashed in it.

The burning sensation immediately experienced by plaintiff in the eye, its bloodshot appearance which immediately followed, show very clearly that he had suffered an external injury to the eye. The blurred vision suffered by plaintiff later on and the almost loss of his sight in his left eye, were consequences, it is reasonable to believe, that resulted from the injury he had received. As plaintiff had perfect vision before the accident and as the consequences referred to followed the accident, the logical conclusion is that they must be traced to the external force which injured his eye and that it was caused by a trauma, as explained by Dr. Dupuy, unless there be any merit in the plea of defendant corporation that the injury to plaintiff's eye was superinduced by other causes due to some pre-existing physical condition.

Dr. Lebourgeois, thinking that plaintiff's tonsils were moderately affected, recommended their removal.

Plaintiff says he had never suffered from his tonsils, and at the suggestion of Dr. Lebourgeois went to Dr. Dautrieve of New Iberia for a general examination.

Dr. Dautrieve did not testify, but plaintiff says Dr. Dautrieve told him, after his examination, that his findings were negative; that he was in sound physical condition, had no affection of the tonsils, and found that his only trouble was with his eye.

■ Plaintiff, it is true, could not have testified about Dr. Dautrieve's diagnosis of his trouble, but could testify to what he had told him as to the result of his examination. The testimony of plaintiff on this subject is not contradicted.

Dr. Jules Dupuy testifies that an exclusive examination was made of plaintiff at the hospital. After an extensive examination no infection of the tonsils, stomach, nor any constitutional disorder was found.

It seems to us that these examinations of the plaintiff show that he did not have an infection of the tonsils or that he had a constitutional disease. The testimony of the plaintiff is also to that effect.

■ It must be held under the evidence that plaintiff was not affected with any disease or constitutional disorder which could have caused the trouble to his eye. As there was no such cause, there must have been some other cause to bring about his loss of vision in the left eye, as it is impossible to hold that the loss of his eyesight in that eye had just come that way and without being the result of any cause, either from a trauma or some constitutional disorder.

The inescapable conclusion is that the affection to his eye was caused by the paint and thinner that went into it from his paddle, hence caused by a trauma, as was testified to by Dr. Dupuy.

■ Dr. Rosenthal, medical expert for defendant, was asked the following question: "Q. Assuming that the ailment to plaintiff's eye that later developed was due to some constitutional cause, now, so assuming, I am asking you whether the trauma could accelerate and put in motion that latent and dormant trouble that was to be superinduced by a constitutional condition? A. Yes, it could."

The proof is, as we have stated, that plaintiff was not affected with any dormant constitutional disease, with tonsil infection or other trouble, but for the sake of argument, let us say, that he was affected with some hidden constitutional disorder, the conclusion must be, that it was activated or accelerated by the injury plaintiff received to his eye.

Accepting this theory of the case, the district judge held, that defendant corporation was liable, citing Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862; Broussard v. Union Sulphur Company, 5 La. App. 340, and many other decisions in line therewith.

The district judge found, however, as we have, that the injury plaintiff suffered to his eye was the result of a trauma resulting from the thinner going into his eye, and that was not traceable to any pre-existing constitutional disorder, but said that, assuming it was due to such disorder, defendant was, however, liable because of the acceleration of a latent or dormant disease.

■ Plaintiff, we find, has established his case with legal certainty, a rule of law which must not be departed from in cases of this character; otherwise seldom, indeed, would corporations escape liability in suits for compensation under the Employers' Liability Act.

After a careful and painstaking examination of this case, we find no reason to reverse the judgment rendered below.

Affirmed.