## O'NIEL v. M. W. KELLOGG CO., Inc., et al.

### No. 2003.

Court of Appeal of Louisiana. First Circuit.

June 30, 1939.

Fred G. Benton and C. G. Spaht, both of Baton Rouge, for appellant.

Taylor, Porter & Brooks and C. W. Phillips, all of Baton Rouge, for appellees.

OTT, Judge.

Plaintiff asks for judgment against the Kellogg Company and its insurance carrier, Travelers Insurance Company, in the sum of $7,780, to cover compensation which he claims to be due him for total permanent disability at the maximum rate of $20 per week for 400 weeks, less compensation for 11 weeks already paid. He alleges that he received a severe injury to his back on November 27, 1937, when he slipped on a mat while attempting to close a door and fell backwards across a steel beam; that he received said injury while working for the said Kellogg Co.

The defendants admit that plaintiff received some sort of an injury on the date alleged and while working for said Kellogg Company and further admit that compensation was paid plaintiff for 11 weeks on account of the said injury, but they deny that he was disabled after the compensation was discontinued; and in the alternative, and in case it is found that plaintiff had not fully recovered from said injury when these payments ceased, and if plaintiff has suffered any disability since these payments were stopped, such disability was caused by his failure to follow the treatment prescribed for him; that if he had followed the treatment prescribed for him, he would have been completely recovered when his compensation ceased.

Judgment was rendered in favor of the defendants, dismissing plaintiff's suit, and he has appealed.

As it is admitted that plaintiff did receive an injury on the date alleged for which compensation was paid for 11 weeks. the questions to be determined are whether or not plaintiff had recovered from the injury and resulting disability when his compensation was discontinued, and if he had not recovered at that time, would he have done so had he cooperated with the doctors and nurses? The answer to these questions involves principally the weighing and evaluation of the testimony given in the case, most of it of a medical nature. The trial judge found as a fact that plaintiff was not fully recovered from his injuries when his compensation ceased, but had he cooperated in the treatment given him, he would have been fully recovered at that time. The judge sums up his finding on this point in the following language:

"Even though plaintiff had not recovered entirely when defendants ceased paying him compensation, this in my opinion was due to his wilful lack of cooperation with his physician. In my opinion, if he had in all respects conducted himself as he should have, that is followed the advice of his doctors and nurses, he would have and should have been well when his compensation payments were stopped. It is my view that he cannot by his own misconduct either make a claim for compensation which he would otherwise not have, or prolong the period of his compensation."

The plaintiff was injured when he fell backwards while opening a door, and the lower part of his back struck a steel beam across the runway leading to the door which he was trying to open. After striking the steel rail, plaintiff fell three or four feet to the ground. He went home and went to bed. The doctor strapped his back with adhesive tape, and sent plaintiff to the hospital late in that day. On the following day, at the request of Dr. Dowell, the regular doctor for the Kellogg Company, an X-ray picture was made of plaintiff's back by Dr. Williams, an experienced radiologist of Baton Rouge. The report of Dr. Williams to Dr. Dowell on Novem-

ber 28, 1937, the day after the accident, was that he found an abnormal widening of the sacro-iliac articulation, with a slight downward rotation of the right sacrum. Attention was also called to the calcified deposits shown to the right of the fourth and fifth lumbar vertebrae. (This latter showing evidently indicating the possible existence of an arthritic condition in this area at that time.) Dr. Williams made three subsequent examinations of plaintiff, the last one being in May of 1938, and found practically the same condition existing in all of these examinations.

Dr. Williams stated in his testimony that the calcified area to the right of the fourth and fifth vertebrae found the day after the accident could not have been caused by the injury. However, he testified, and the medical testimony shows, that a severe blow or trauma over or near this calcified area could aggravate a pre-existing arthritic condition. But the general trend of the medical testimony seems to support the conclusion of the trial judge that the injury to plaintiff's back was too far down to affect or aggravate this pre-existing condition. We are certainly not able to point out any manifest error in the finding of the trial judge on this point.

In regard to the separation in the right sacro-iliac joint found by Dr. Williams, he says in his testimony that the separation was slight, which we understand to mean barely more than normal. He says there are four degrees of separation of the sacro-iliac joints; viz., slight, moderate, severe and exaggerated, and that the separation shown in the X-ray of plaintiff's right sacro-iliac joint was slight.

Dr. Dowell treated plaintiff for the back injury in accordance with the report made by Dr. Williams—that is by strapping plaintiff's back and requiring him to remain quiet and in an immobile position. After a few days in the hospital, plaintiff was able to get out and walk around.

In addition to Dr. Williams, plaintiff introduced Dr. Darby, a young physician, who first examined plaintiff on March 7, 1938, about a month after Dr. Dowell had withdrawn from the case because of some trouble with plaintiff. Dr. Darby found on this first examination that plaintiff suffered pain over the right sacro-iliac articulation and over the posterior portion of the right thigh when he raised his right leg in a forward position; that he had a limitation of motion in the spine on bending forward, and that rotation of the right leg was painful. Dr. Darby sent plaintiff to Dr. Williams for an X-ray examination and, as already stated, Dr. Williams found the condition of plaintiff to be about the same as in his previous reports. Dr. Darby prescribed a sacro-iliac belt for plaintiff to wear, gave him massages and infra-ray treatment for what the doctor diagnosed as a sacro-iliac strain or separation. The doctor's prognosis of the case is that, if plaintiff has a separation of the sacro-iliac joint, he is unable to do hard manual labor, and without an operation the condition cannot be cured, although with proper treatment, his condition may improve. Dr. Darby admitted that what he knew of the case—or plaintiff's condition—is what the X-ray shows and what the plaintiff himself told about his pain and subjective condition.

Dr. Dowell called to see plaintiff a short time after the accident and found brush burns on the lower right side of plaintiff's back with a slight swelling over the bruise. The doctor thought plaintiff had a back strain that would clear up in the usual time of two weeks to two months. The doctor strapped plaintiff's back with adhesive tape and prescribed medicine for the relief of pain. On the day following the accident, as already stated, Dr. Dowell requested Dr. Williams to make an X-ray of plaintiff's back, and on receiving Dr. Williams' report, Dr. Dowell applied more adhesive strappings and ordered plaintiff to stay in bed and rest. Plaintiff stayed in the hospital some five days, after which he was discharged as able to walk around. The doctor ordered him to apply external heat to his back and come to the doctor's office for treatment.

After five days, plaintiff came to the doctor's office and returned more or less regularly until January 11, 1938, during which time he received treatment of heat applications. On the latter date, plaintiff was sent back to the hospital where he remained until about February 7, 1938, during which time the doctor treated him by putting him to bed with weights on his legs to relieve the pain, and by putting on a plaster cast. The first plaster cast was torn off by plaintiff, he says, because it choked him. Dr. Dowell says that plaintiff was very erratic and complaining while in the hospital this second time. Plaintiff was discharged from the hospital about February 7th, as stated above, and he was

able to walk around town, and even tended a bar three days out of a week. He came to the office of Dr. Dowell and created a disturbance on two or more occasions, his conduct being so threatening on two occasions that it was necessary to call an officer. During one of these encounters, while plaintiff was apparently drunk, it was necessary for him to be taken to jail. Plaintiff went back to the hospital and created a disturbance at the hospital on account of his drunken and turbulent conduct. Dr. Dowell called on him at the hospital and tried to quiet him, but plaintiff cursed and abused the doctor and told him that he was going to get another doctor. Dr. Dowell retired from the case, but for several days after that plaintiff continued to call the doctor and have others call for him, but the doctor refused to have anything further to do with the case. Plaintiff persisted in coming to the doctor's office in a belligerent attitude apparently under the influence of liquor, and it was during one of these visits that he became so threatening and unruly as to make it necessary for the officers to put him in jail. He stayed in jail several days.

While plaintiff was in the hospital the second time, the evidence shows that he was stubborn and on several occasions left the hospital without permission, and went out on the grounds; that at times he would not take his medicine. One of the nurses says she found whiskey bottles under his mattress. He became so unruly at one time that it was necessary to move him from the second floor to the third floor. It is also shown that plaintiff rode on the running board of an automobile, danced some at a night club and rode a bicycle after he was injured.

In addition to Dr. Dowell, the defendants called three other doctors, Dr. J. L. Menville, an expert radiologist, Dr. J. T. O'Ferrall, a noted orthopedic specialist, and Dr. R. B. Harrison, an experienced surgeon. Dr. Menville made X-ray pictures of plaintiff's back and also read those made by Dr. Williams. All three of these eminent doctors testified that there was no abnormal separation of plaintiff's sacro-iliac joint. They say that both joints are normal. Both Drs. O'Ferrall and Harrison agree with Dr. Dowell in his opinion that plaintiff suffered a back strain which, with proper treatment, should be cured in less than 8 weeks. They say

that Dr. Dowell was giving plaintiff the proper treatment.

In view of the fact that Dr. Williams testified that the widening of plaintiff's sacro-iliac joint was only slight, that is barely more than normal, and in view of the opinions of the four doctors called by defendants that there is no abnormal separation of the sacro-iliac joint, we must conclude that plaintiff did not suffer a sacro-iliac separation, but suffered only a sprain or strain which the medical testimony shows should be cured in less than 8 weeks.

While the evidence does show that plaintiff was not able to do hard manual labor at the time his compensation was stopped, yet we cannot say that the trial judge was wrong in finding that plaintiff's disability at that time was due to his failure to cooperate with the doctors and nurses who were treating him, and because of his own acts of indiscretion.

If an employee's improper and unnecessary activity or inactivity, conduct or misconduct, or his wilful and unreasonable failure to cooperate in the treatment given him seriously retards his recovery and prolongs his disability, he cannot recover compensation beyond the period that would have been necessary for his recovery had he properly cooperated. Bywog v. La-Tex Community Oil Company, Inc., 3 La. App. 699; Savin v. T. Smith & Sons, Inc., La.App., 143 So. 728; Costello v. French Market Ice Company, La.App., 159 So. 466.

Being unable to find any error in the judgment appealed from, it is hereby affirmed.

DORE, Judge.

I respectfully dissent in this case for the reason as admitted by the majority opinion that at the time the plaintiff discharged Dr. Dowell, that is, on February 11, 1938, he was then disabled and was in a cast. It is my recollection that Dr. Dowell, the physician of the defendant, stated at that time that plaintiff had not recovered from his injury. I further am of the opinion that in accordance with Dr. Williams' testimony, a radiologist of defendant, at that time was of the opinion that the injury received by the plaintiff accelerated the arthritic condition which plaintiff seems to have been suffering, in

and at about the fourth and fifth lumbar vertebrae.

I place no importance on the fact that plaintiff may have flirted with the lady at the hospital, his being seen riding a bicycle or his proffer of dancing with two young ladies, as testified to by witnesses for the defendant. These witnesses were not definite as to the time that they saw the plaintiff indulge in these presumed violations of the doctor's instructions as to the treatment prescribed by him. These witnesses, in accordance with their testimony, do not state whether or not the pleasure stunts indulged by the plaintiff were before or after February 11th, at which time he is presumed to have discharged Dr. Dowell and compensation ceased.

I am of the opinion that plaintiff is entitled to recover compensation for a period of 400 weeks, save and except granting unto defendant at any time the right to show that plaintiff has fully recovered.