## REEVES v. UNION SULPHUR CO.

### No. 2091.

Court of Appeal of Louisiana. First Circuit.

Jan. 30, 1940.

Rehearing Denied March 4, 1940.

M. R. Stewart, of Lake Charles, for appellant.

Liskow & Lewis, of Lake Charles, for appellee.

OTT, Judge.

Plaintiff sues for compensation at the maximum rate of $20 per week for 400

weeks, less $400 paid as compensation for twenty weeks, and he appeals from a judgment which rejected his demands for additional compensation.

It is undisputed that plaintiff suffered a fracture of the scaphoid bone of his right wrist on September 28, 1938, as he was assisting in lowering pipe in an oil well when the latch of a pair of tongs which he was holding flew out and hit his right arm; that plaintiff was paid compensation at $20 per week for twenty weeks; that he was given light work in painting pipes and driving a car from February 17th to April 1, 1939, and was paid wages at 92 cents per hour, the wages he was receiving before the injury. On April 1, 1939, plaintiff quit work, because, as he claims, the work which he was then doing (cutting grass with a double-edge hand scythe) caused pain in his wrist and was the kind of work he could not do. The employer claims, however, that plaintiff voluntarily quit this work because he did not want to do this kind of work, and not because he could not do it.

The defense is that plaintiff suffers no further disability other than that for which he has been paid in compensation and wages, but if he does suffer further disability, it is the result of his own failure to co-operate with his physician and follow his instructions for treatment.

■ As plaintiff received either maximum compensation or practically full wages from the date of the injury to April 1, 1939, his ability to work must be determined as of the latter date. Ulmer v. E. I. Du Pont De Nemours & Co., La.App., 190 So. 175. Therefore, the two questions presented in the case are: (1) Has plaintiff proved by a preponderance of the evidence that his disability to perform hard manual labor continued after he quit cutting grass on April 1, 1939; and (2) if he was not able on that date to perform hard manual labor, was his disability caused by reason of his failure to co-operate with his physician and his own misconduct and indiscretion?

On the first question, the trial judge, after reviewing the evidence, concluded that the fracture of the wrist had sufficiently healed to permit the performance by plaintiff of hard manual labor. However, he expressed some doubt on that point as he further fortified his conclusions with the statement that, if plaintiff was not able to perform manual labor, it was because of his failure to co-operate with his physician and his own misconduct. We find ourselves in the same state of mind as the learned trial judge on these points, and find no manifest error in the conclusions that he reached.

No doubt the kind of work plaintiff was doing when injured is rather hard manual labor. He had to lift and handle oil well pipes and equipment, and the nature of the work is indicated by the name commonly applied to it, that of "rough-necking." That the use of both hands was required in this kind of work is apparent.

Dr. W. G. Fisher treated plaintiff's wrist fracture. He put the arm in a plaster cast and applied periodic heat treatments. The cast remained on plaintiff's arm for ten weeks, after which the arm was put in a light aluminum splint which was kept on for six weeks or more. X-ray pictures were made of the arm at intervals to determine the progress in healing, and plaintiff visited the doctor two or three times a week for some four or five months.

Dr. Fisher testified that the fourth X-ray made in February, 1939, showed that the fracture had almost completely healed by a bony union. About the middle of February, the doctor recommended that plaintiff be given light work so as to give exercise to the arm and restore its use. It was as a result of this recommendation of the doctor that plaintiff was given work of painting pipes and driving a car. He began this work on February 17, 1939, and worked until the latter part of March without any complaint of pain or inconvenience, so far as the record shows. Moreover, plaintiff requested during this time that he be put back at his old job of rough-necking, but Dr. Fisher did not think it advisable for him to take the chance of re-injuring his arm until the healing was complete and normal function was restored.

Dr. Kushner examined plaintiff some six weeks before the trial and found a swelling in his right wrist. He examined an X-ray made of the arm a few days before the trial and found a fragment of bone displaced and a kind of cracking sound on movement of the wrist. He also found a limitation in the backward flexion of the right wrist and a weakness in the grip of the hand. This doctor expressed the opinion that plaintiff was not at the date of the trial in the first part of June, 1939, able to do oil field work. He did think plaintiff should do light work to exercise his arm.

Dr. Lamansky examined plaintiff some three weeks before the trial, as well as some X-ray pictures previously made of his arm, and this doctor expressed the opinion that plaintiff could not do hard manual labor; that he had a limitation of movement of forty or fifty per cent. The doctor admitted, however, that his opinion was based partly on the history of the case as given him by the plaintiff and his subjective complaints of pain on movements of the wrist; that if later X-ray pictures showed a bony union of the fracture, plaintiff should begin to exercise his wrist by some kind of work.

Dr. White examined plaintiff and the X-ray picture a few days before the trial and expressed the opinion that plaintiff was not able to do hard manual labor, but, like the other two doctors, his conclusion was partly based on subjective symptoms of pain and the history of the case as given by plaintiff.

Doctors McKinney, Watkins and Fisher were called by defendant. Dr. McKinney made X-rays of plaintiff's arm in September, November and December 1938, and February and May, 1939, in connection with the treatment of plaintiff by Dr. Fisher. According to Dr. McKinney, these pictures show a gradual healing of the fracture from the first picture to the last one taken in May, a few days before the trial. Dr. McKinney concludes his statement of the condition shown in the last picture as follows: "From a purely X-ray standpoint, having made no clinical examination, whatever, I would say that the disability in the wrist at the present time is nothing."

Dr. Watkins examined plaintiff the latter part of December 1938 or the first part of January 1939, and also a few days before the trial. He also examined all of the X-rays made by Dr. McKinney. This doctor expressed the opinion that plaintiff is not only able to do manual labor, such as oil field work, but that such work would be good for him.

We have given due consideration to the opinions of all these doctors, but we think that Dr. Fisher who treated plaintiff for four or five months was in a much better position to know his condition than any one else. In fact, all of the other doctors admit this and we are very much impressed with Dr. Fisher's fairness and apparent desire to give a true statement of plaintiff's condition.

We have already referred to Dr. Fisher's treatment of the arm, and we might give his opinion of plaintiff's ability to work at the time of the trial in the doctor's own words, as follows:

"He has a good callus formation, and it should withstand almost any ordinary shock, any type of hard labor that didn't give a condition that (would) fracture his hand, it should withstand that blow. I don't think his bone has completely healed, but I think from looking at the picture and from a clinical standpoint he is able to do hard work at the present time."

We cannot say that the trial judge was in error in his finding that plaintiff had failed to prove that he was disabled from doing manual labor after he quit work on April 1, 1939. But if there could be any doubt on this point, we agree with the trial judge that plaintiff's lack of co-operation retarded his recovery.

We gather from Dr. Fisher's testimony a reluctance on his part to give the full extent and effect which plaintiff's conduct had on his recovery. It is shown that the cast was taken off by plaintiff on several occasions, or was permitted to become loose at times, thus preventing a complete immobilization of the wrist at a time when this was a very important part of the treatment. During the time that he had on the cast, he was in a car wreck and broke through a door with his shoulder and body while intoxicated in a saloon. His arm was bruised by some blow on one or two occasions while the cast was on it. While it is not shown that any serious injury was sustained to the fractured bone by these acts of indiscretion on the part of plaintiff, yet the impression is given that these acts did retard recovery. Certainly, this kind of conduct was not calculated to help the condition.

Be that as it may, we think plaintiff's attitude when he quit work shows a disposition of non-cooperation. He could do some kind of work and his employer not only showed a disposition to help him restore his arm to usefulness, but paid him practically the same wages during the recovery as he received before the injury. We think that plaintiff quit cutting grass because he did not want to do that kind of work, rather than his inability to do it. According to a preponderance of the evidence, after plaintiff had cut grass for three or four hours on April 1st, he quit and told his employer that he did not (or would not) cut grass at home, and that he could not (or would not) cut it for the defendant company.

■ Where an employee's recovery is retarded and his disability prolonged because of his failure to cooperate with his physician and his wilful refusal to avail himself of means for his recovery furnished by his employer, such employee cannot recover compensation beyond the period that would have been necessary for his recovery had he properly cooperated. See O'Niel v. Kellogg Company, La.App., 190 So. 182, and cases there cited.

■ The courts have adopted a liberal construction of the compensation law by permitting an employee to recover total disability payments where an injured member or organ of the body prevents him from doing the same kind of work that he was doing when injured, even though he is able to do other kinds of work. We are in complete accord with this interpretation, but we are also in accord with the rulings that the employee has the duty of using all reasonable means afforded him for his recovery and in cooperating with his employer in minimizing the damage and loss sustained by the employer whenever he can reasonably do so.

It seems that plaintiff was asked by his counsel on the trial of the case to state what two or three doctors told him after their examination of him. Objection was made to the questions, and the objection was sustained. We are asked to remand the case to admit this testimony in case we find that the evidence does not show disability. We are referred to the case of Landers v. New Iberia Motor Co., 155 So. 278, decided by this court, as authority for the admissibility of the evidence.

■ It is stated in the cited case that an employee may testify to what a doctor told him as the result of an examination where the doctor does not testify, but that the employee could not testify about the doctor's diagnosis of his trouble. While the compensation law provides that the judge shall not be bound by the technical rules of evidence in deciding disputed issues, the law requires that all findings of fact must be based on competent evidence. Jones v. Dendinger, Inc., et al., La.App., 147 So. 732.

■ We know of no exception to the hearsay rule that would permit the plaintiff in a suit to testify as to what a doctor told him was the result of an examination where the doctor himself does not testify and give the opposite side an opportunity to cross-examine. We do not know just what is meant by permitting an employee to testify as to what a doctor told him was the result of an examination. We can hardly think it is meant that an employee could testify that he was examined by a certain doctor who told him that the doctor found that he (the employee) had a fractured wrist and that this fracture had not healed and rendered the employee unable to do manual labor. This court, as presently constituted, does not think the tendered evidence was admissible, certainly not in the form of the questions asked and the answers sought.

■ Conceding, however, for the purposes of this case, that plaintiff should have been allowed to state what the doctors told him (and we do not want to be understood as holding that he had a right to do so), yet we can hardly see how such a statement from him uncorroborated by the doctors themselves could have changed the result. We see no reason to remand the case.

For the reasons assigned, the judgment is affirmed.